IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| HULSE STUCKI, | § |
| | § |
| Appellant, | § |
| | § |
| v. | § Civil Action No. **3:12-CV-1064-L** |
| | § |
| MATTHEW ORWIG, | § |
| Chapter 11 Trustee, | § |
| | § |
| Appellee. | § |

## MEMORANDUM OPINION AND ORDER

Before the court is the appeal of Hulse Stucki, filed April 5, 2012. After consideration of the brief,[1] record on appeal, and the applicable law, the court **affirms** the order of the bankruptcy court entered on February 7, 2012.

**I.     Background**

Hulse Stucki ("Stucki" or "Appellant") appeals the bankruptcy court's order confirming the Chapter 11 Trustee's amended plan of liquidation (the "Plan") for FirstPlus Financial Group, Inc. ("FirstPlus" or "Debtor") entered on February 7, 2012. Stucki contends that the Plan, which treats the unsecured claims of certain FirstPlus shareholders the same as the claims of general unsecured creditors, violates 11 U.S.C. § 1129(a)(1) and (a)(3) because: (1) the shareholder claims are subject to mandatory subordination pursuant to 11 U.S.C. § 510(b); and (2) allowing payments to the shareholders when the general unsecured creditors have not been paid in full violates the absolute priority rule in 11 U.S.C. § 1129(b)(2)(B)(ii).

---

[1] Appellee filed no brief in opposition to the Appellant.

**Memorandum Opinion and Order - Page 1**

On June 23, 2009, FirstPlus filed for bankruptcy under Chapter 11. Bankr. Docket Sheet, Mini R. Volume 1, 38. Matthew Orwig ("Orwig," "Appellee," or "Trustee") was appointed the Chapter 11 Trustee for FirstPlus. Appellee R. 604, ¶ 5. Stucki filed a general unsecured proof of claim in the amount of $121,236. Appellant's Br. 7. Appellee proposed a plan of liquidation that designated Stucki's claim as a Class 3a general unsecured claim and the claims of certain shareholders as Class 3b claims. Appellee R. 894, ¶ 12. The Plan also proposed to place the Class 3(b) claims on equal footing with the Class 3(a) claims in allowing it to share *pro rata* any funds to be paid to the general unsecured creditors of Class 3(a). Appellant R. 194.

The Class 3(b) shareholders previously filed a lawsuit in March 2005 in Nevada state court to compel a shareholders' meeting and election of directors (the "Nevada Action"). *Id.* at 232. At the time the Nevada Action was commenced, FirstPlus had not had an annual meeting of shareholders since March 4, 1998. *Id.* FirstPlus filed an answer and counterclaim, asserting claims against the plaintiffs for numerous legal violations against FirstPlus, including but not limited to intentional torts, negligent torts, breaches of contract, breaches of fiduciary duties, abuse of process, infringements on trade names, perjury, and civil conspiracy. *Id.* FirstPlus and the Nevada Action shareholders, however, entered into a settlement agreement (the "Settlement Agreement") in which: (1) FirstPlus agreed to pay certain of the plaintiffs' expenses arising form the Nevada Action; (2) the parties agreed to dismiss all claims and counterclaims with prejudice and exchanged mutual releases; and (3) FirstPlus agreed to instruct the Grantor Trust to make an initial distribution to the holders of its common stock on a *pro rata* basis, equal to 50% of the funds received from the FPFI[2]

---

[2] FPFI is a wholly-owned subsidiary of FirstPlus. It filed for reorganization under Chapter 11 of the Bankruptcy Code in March 1999. FirstPlus filed an unsecured proof of claim in an amount of approximately $133,634,581 in FPFI's bankruptcy case. In April 2000, the bankruptcy court confirmed the FPFI Plan. Under the FPFI Plan, the Liquidating Trust was created to, among other things, administer FPFI's property and make payments to its creditors. The FPFI Plan

**Memorandum Opinion and Order - Page 2**

Liquidating Trust (the "Initial Distribution"), and following the Initial Distribution, FirstPlus was required to make annual distributions of 50% of the funds received by the Grantor Trust from the FPFI Liquidating Trust to shareholders on a *pro rata* basis. *Id.* In light of the Settlement Agreement, the Nevada Action was dismissed on April 7, 2006. *Id.*

FirstPlus made the Initial Distribution to the shareholder class under the Settlement Agreement but failed to make any subsequent distributions. *Id.* To compel these distributions, James Hansen ("Hansen"), a shareholder of FirstPlus, filed a lawsuit (the "Hansen lawsuit") on behalf of the shareholder class in Nevada state court for, among other things, breach of the Settlement Agreement, specific performance, and the appointment of a receiver. Appellee R. 250, 892. After FirstPlus filed for bankruptcy, Appellee and Hansen's counsel negotiated a settlement of the Hansen lawsuit, approval of which would have resulted in, *inter alia*, the allowance of a claim in the amount of $8,557,689.83 for the breach of the Settlement Agreement ("Breach Claim"). Appellee R. 892. Orwig and Hansen filed a joint motion to approve the settlement and compromise, to which Stucki objected. *Id.* ¶ 47; Appellee R. 623-625. The bankruptcy court approved the settlement and compromise over Stucki's objection. Appellee R. 835. Stucki did not appeal the bankruptcy court's order. Appellee R. 610, ¶ 50.

On September 8, 2011, Appellee filed the Plan with the bankruptcy court. Bankr. Docket Sheet, Mini R. 124. Stucki requested that Orwig file an adversary proceeding to subordinate the shareholder class claims to the claims of the general unsecured creditors. Appellee R. 868. Counsel for Orwig declined to do so. *Id.* Stucki filed an objection to the confirmation of the Plan on January

---

also allowed FirstPlus's unsecured claim against FPFI in an amount not less than $50 million to be paid out of the FPFI Liquidating Trust over time. The claim accrues simple interest at 8.5% per annum until paid in full. Appellee R. 609-10.

**Memorandum Opinion and Order - Page 3**

12, 2012. In response, Orwig contended that Stucki's objections should be overruled because: (1) they were barred by *res judicata*; (2) they should have been raised on direct appeal from the bankruptcy court's order approving the settlement over Stucki's objection and order approving the disclosure statement filed by Orwig and, thus, were impermissible collateral attacks on such orders; and (3) the Breach Claim was not subject to subordination pursuant to 11 U.S.C. § 510(b), as it did not arise from the "purchase or sale" of securities. Appellee R. 894-895, 899, 903. On February 7, 2012, the bankruptcy court confirmed the Trustee's Plan over Stucki's objection. Appellant R. 6, 11, 17. According to the bankruptcy court's order:

> J.   A reasonable justification exists for the classification and treatment of the Class 3(a) Unsecured Claims and the Class 3(b) Breach Claim. The Breach Claim arises from the breach by the Debtor of its prior settlement agreement with the Shareholder Class, not on account of any recovery by members of the Shareholder Class of their respective equity investments. Thus, the Breach Claim should not be subordinated under Bankruptcy Code § 510(b), and the Breach Claim will be treated on equal footing with the Class 3(a) Unsecured Claims. Moreover, the settlement of any 510(b) issues that could arguably affect the Breach Claim on the terms set forth in the Plan is fair, equitable, and reasonable.

*Id.* at 11. Stucki timely filed a notice of appeal on February 17, 2012.

## II.   Legal Standard

In a bankruptcy appeal, district courts review bankruptcy court rulings and decisions under the same standards employed by federal courts of appeal: a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law *de novo*. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003); *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re National Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir.), *cert. denied,* 531 U.S. 871 (2000).

A bankruptcy court's "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed. R. Bankr. P. 8013. A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been made." *In re Dennis*, 330 F.3d at 701 (citation omitted). In conducting this review, the court must give due regard to the opportunity of the bankruptcy judge to determine the credibility of the witnesses. *Id.*; *see also Young v. Nat'l Union Fire Ins. Co. (In re Young)*, 995 F.2d 547, 548 (5th Cir. 1993) (quoting Fed. R. Bankr. P. 8013).

## III. Analysis

Before proceeding to the analysis, the court notes that Appellee has not filed a brief in this case. The failure of one side to submit briefing makes it particularly difficult for this court to evaluate the merits of any matter because the court does not have the benefit of the other side's authorities and points of view. Even though the failure of Appellee to file a brief is unprofessional, it does not entitle Appellant to a ruling in his favor, since he still carries the burden of showing that a bankruptcy court's findings are clearly erroneous to prevail on appeal. *See Matter of Multiponics, Inc.*, 622 F.2d 709, 723 (1980) (citing *Griffin v. Missouri Pac. Ry. Co.*, 413 F.2d 9 (5th Cir. 1969)); *see also* Fed. R. Bankr. 8013.

Stucki raises two issues on appeal. First, he contends that the bankruptcy court erred in finding that the claims of former shareholders of FirstPlus were not subject to mandatory subordination pursuant to 11 U.S.C. § 510(b). Second, he asserts that the bankruptcy court erred in finding that the treatment of former shareholder claims *pari passu* with the claims of allowed general unsecured creditors did not violate the absolute priority rule. He requests that the confirmation order be reversed and confirmation be denied.

**Memorandum Opinion and Order - Page 5**

### A. Whether the Bankruptcy Court Erred by Finding the Shareholders' Claims Were Not Subject to Mandatory Subordination Pursuant to 11 U.S.C. § 510(b)

Title 11 U.S.C. § 1129(a)(1) and (a)(3) provide that "[t]he court shall confirm a plan only if . . . the plan complies with the applicable provisions of this title. . . . [and t]he plan has been proposed in good faith and not by any means forbidden by law. Stucki first contends that the liquidation plan violates these two provisions because the claims of the shareholders should have been subject to mandatory subordination under 11 U.S.C. § 510(b).

"Subordination alters the otherwise applicable priority of a claim under the bankruptcy code." *In re SeaQuest Diving, LP*, 579 F.3d 411, 417 (5th Cir. 2009). Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

"Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *In re SeaQuest*, 579 F.3d at 417 (quoting *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir. 2007) (internal quotation marks omitted)).

There are three distinct categories of claims subject to mandatory subordination under § 510(b):

> (1) a claim arising from rescission of a purchase or sale of a security of the debtor (the rescission category); (2) a claim for damages arising from the purchase or sale of a security of the debtor (the damages category); and (3) a claim for reimbursement or contribution allowed under 11 U.S.C. § 502 on account of either (1) or (2).

*Id.* at 418. Stucki does not explicitly state the category under which the Breach Claim falls. Because

there is no allegation of a claim by the shareholders for rescission of a contract but rather only a claim for breach of contract, and there is no allegation of a claim for reimbursement or contribution, the court determines that Stucki argues that the Breach Claim falls within the damages category. Thus, the issue is whether the Breach Claim qualifies as a claim "for damages arising from the purchase or sale" of a security of the debtor. If so, it must be subordinated to general unsecured creditors like Stucki, whose Class 3(a) claims have a high priority.

In the underlying bankruptcy proceeding, Orwig argued that the Breach Claim was not subject to subordination pursuant to § 510(b) because their claims did not arise from the *purchase or sale* of equity interests. Stucki contends that Orwig impermissibly recasts the Breach Claim as arising out of the Settlement Agreement and not out of the ownership of stock. According to Stucki, because the shareholders would not have a claim if they did not own stock in FirstPlus, the Breach Claim arises out of the ownership of stock not out of the Settlement Agreement.

Some courts have narrowly construed the statutory language in § 510(b) to only require subordination to claims alleging fraud during the issuance of the securities and not to post-issuance misconduct. Lydia Rogers, *The Bankruptcy Implications of a Court-Ordered Buyout for Shareholder Oppression: Is It a Remedy at All?*, 64 Baylor L. Rev. 594, 610-11 (2012) (citations omitted). The Fifth Circuit, along with the Second, Third, Ninth, and Tenth Circuits, however, have used a perceived "ambiguity" in the language of § 510(b) to broadly apply subordination to post-issuance conduct. *Id.* (citations omitted). Thus, "a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract." *In re Seaquest*, 579 F.3d at 421 (citations omitted). Nonetheless, there still "must be some nexus or causal relationship between the claim and the sale," for a claim to arise from the purchase or sale of

a security. *Id.* Furthermore, an important factor in deciding whether a claim arises from the purchase or sale of security for the purposes of § 510(b) is whether the claim in effect recaptures the claimant's equity investment from the debtor. *See id.* ("Further, the fact that the claims . . . seek to recover a portion of the claimant's equity investment is the most important policy rationale.") (citing *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002) ("Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding) and *In re Geneva Steel Co.*, 281 F.3d 1173, 1179 (10th Cir. 2002) ("[I]t is clear that Congress embraced Professors Slain and Kripke's theory of risk allocation, namely, that general creditors assume a different type of risk with respect to the debtor's insolvency than do investors. And not only are general creditors unable to share in the potential benefits flowing from company success, they rely on the equity cushion created by the investors' capital contributions for payment. While Slain and Kripke focused primarily on shareholder rescission claims, their larger concerns sprang from what they termed the 'disaffected stockholder's efforts to recapture his investment from the corporation.'" (citations omitted)).

Appellant suggests that mere ownership of a security interest is enough to bring a claim within § 510(b)'s reach. The court disagrees. The Breach Claim should not be subject to mandatory subordination merely because the claimants are shareholders. *See In re Telegroup*, 281 F.3d at 144 n.2 ("Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies underlying § 501(b), which was intended to prevent shareholders from recovering their equity

investment in parity with general unsecured creditors."); *In re DirecTV Latin America, LLC*, No. 03-10805 (PJW), Civ. 03-981-SLR, 2004 WL 302303, at *3 (D. Del. Feb. 4, 2004) ("[S]imply being a holder of equity interest would be too broad of a basis to justify subordination of claims."). The statute does not state that any claim arising from "ownership" of a security is subject to mandatory subordination; rather, it states, in relevant part, claims arising from damages relating to the *purchase or sale* of a security are subject to mandatory subordination. *See In re Angeles Corp.*, 177 B.R. 920, 927 (Bankr. C.D. Cal. 1995) ("If Congress had wanted to subordinate all claims of security holders to an equity position, regardless of the source of the claim, Congress would have worded Section 510(b) to say: 'All claims made by all security holders, regardless of the source of claim, shall be subordinated to an equity class . . .' However, Bankruptcy Code Section 510(b) does *not* say this. Thus, Section 510(b)'s subordination of claims 'arising from the sale or purchase of a security' must mean subordinating *less* than *every* claim of a security holder, regardless of how that claim arises."). Moreover, as already noted, circuit precedent requires that there be some nexus, or causal relationship between the claim and the sale. Here, the Breach Claim arises from the Hansen lawsuit, which was a suit for breach of the Settlement Agreement. The Hansen lawsuit sought to enforce distributions that FirstPlus failed to make pursuant to the Settlement Agreement   not distributions arising from the purchase or sale of any security interests in FirstPlus. Moreover, the Settlement Agreement did not resolve a lawsuit brought by shareholders seeking damages in connection with the purchase or sale of a security; it arose out of a lawsuit in which the shareholders sought to compel a shareholders meeting and election of directors.

     Stucki cites  *In re Seaquest* and *In re Deep Marine Holdings, Inc.*, No. 09-39313, 2011 WL 160595 (Bankr. S.D. Tex. Jan. 19, 2011), in support of his argument that the Breach Claim should

**Memorandum Opinion and Order - Page 9**

be subject to mandatory subordination under § 510(b).  In *In re Seaquest,* the Fifth Circuit addressed whether a unsecured claim based on a state court judgment was subject to mandatory subordination on the basis that it arose from the rescission of a purchase or sale of a security of the debtor.  579 F.3d at 414.  In that case, the claimant contributed all of its corporate assets in exchange for all the of the joint venture's shares of stock.  *Id.*  After the joint venture failed, a lawsuit was filed.  *Id.* at 415.  The parties entered a settlement agreement that effectively rescinded the joint venture agreement and returned the claimant's capital contributions.  *Id.*  When the transaction contemplated by the settlement agreement never occurred, a second lawsuit was filed, which ultimately resulted in a judgment against the debtor for breach of contract.  *Id.* at 416.  The debtor filed for Chapter 11 bankruptcy and the claimant, asserting that it was a judgment creditor, sought to recover the sums awarded by the state court.  *Id.*  The Fifth Circuit held that "[f]or purposes of § 510(b), we may look behind the state court judgment to determine whether the . . . claim 'arises from' the rescission of a purchase or sale of a security of the debtor."  *Id.* at 423 (citing *In re U.S. Wireless Corp., Inc.*, 384 B.R. 713, 720-723 Bankr. D. Del. 2008).  Finding that there was a causal relationship between the claim and the sale, the court held that subordination was mandatory under § 510(b).  *Id.* at 426.

The court, however, finds that the claim at issue in *In re Seaquest* is distinguishable from the present case.  The causal relationship between the claim and any effective sale of securities in the case at hand is weaker than the relationship in *In re Seaquest*.  Although the claim in *In re Seaquest* was similarly based on a breach of a settlement agreement, the debtor's debt obligations under the settlement agreement in that case arose from the rescission of the claimant's equity stake in the debtor.  *See id.* at 424 n.8.  Here, the Breach Claim, although based on breach of a settlement agreement, FirstPlus's obligations to the shareholders under the Settlement Agreement, arose from

**Memorandum Opinion and Order - Page 10**

an agreement by shareholders to withdraw their lawsuit seeking to compel a shareholders' meeting and election of directors. From the record, it does not appear that the shareholders, in bringing this lawsuit, sought to recoup their equity investment like the claimant in *In re Seaquest*.

Moreover, *In re Deep Marine Holdings* is also distinguishable. In that case, like *In re Seaquest*, there was a stronger nexus between the claim and the purchase and sale of a security interest. In *In re Deep Marine Holdings*, the claimants were former minority shareholders in a company that was acquired in short-form merger, which, under Delaware Law, does not require a shareholder vote. 2011 WL 160595, at *1. The minority shareholders only choice was to accept $0.01 per share the purported fair value offered by the debtors for a company that had been valued at $100 million just one year earlier, or to seek appraisal rights for their "confiscated" shares under Delaware law. *Id.* Choosing the latter, the minority shareholders filed a lawsuit seeking to exercise their statutory appraisal rights for the shares acquired through the short-form merger. *Id.* The lawsuit also included additional claims for breaches of fiduciary duties by former officers, directors, and controlling shareholders; aiding and abetting the breaches of fiduciary duty; unjust enrichment; fraud; and wrongful equity dilution, among others. *Id.* The unsecured creditors sought subordination of the minority shareholders' claims based upon the Delaware law suit. *Id.* at *2. Thus, at issue before the bankruptcy court was whether § 510(b) includes claims that arise during the course of a claimant's ownership of a security or, instead, whether § 510(b) only encompasses claims for damages incurred through the actual purchase or sale of a security. *Id.* at *4. The bankruptcy court held that the minority shareholders' claims based upon the Delaware lawsuit were subject to mandatory subordination because they arose from the merger, which was essentially a sale of the claimants' stock. *Id.* at *7.

The court observes that in both *In re Seaquest* and *In re Deep Marine Holdings*, the claims essentially sought to recover the claimants' equity interests in the debtor. There is no suggestion in the record that the shareholders sought to do the same here. The court therefore concludes that the connection or causal relationship between the Breach Claim and the actual or virtual purchase or sale of any security interests in FirstPlus is too attenuated to bring it within § 510(b)'s reach.

B.  **Whether the Bankruptcy Court Erred in Finding that Payments to the Shareholder Claims When the General Unsecured Creditors Were Not Paid in Full Did Not Violate the Absolute Priority Rule**

The next issue raised by Stucki is whether allowing payments to the shareholders when the general unsecured creditors were not paid in full is a violation of the absolute priority rule of 11 U.S.C. § 1129(b).

Section 1129 of the Bankruptcy Code governs the confirmation of plans of reorganization in Chapter 11 cases. Section 1129(b) provides that a proposed plan of reorganization must be confirmed if it meets all the general requirements outlined in § 1129(a). *Southern Pacific Transp. Co., v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373, 385 (E.D. Tex. 2000). One of those requirements is that every class of claims or interests votes to accept the plan, including each class of impaired creditors, in which case the plan is deemed consensual. *Id.*; *see also* 11 U.S.C. § 1129(a)(8). A class of claims is deemed to have accepted the plan if at least two-thirds in amount and one-half in number of the members of that class vote to accept the plan. 11 U.S.C. § 1126(c). "If an impaired class of creditors votes to reject the plan, the plan becomes unconfirmable unless the bankruptcy court finds that it satisfies what is commonly known as the cramdown provision of § 1129(b)." *Southern Pacific*, 252 B.R. at 385-86. A plan that has not been accepted by all impaired classes may be confirmed or "crammed down" over an dissenting class only if "does not discriminate

unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b). "A plan may be deemed fair and equitable to a dissenting class only if it complies with the absolute priority rule." *Southern Pacific*, 252 B.R. at 386 (citing *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 441-42 (1999)); *see also* 11 U.S.C. § 1129(b)(2)(B)(ii). "[T]he absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (citations and internal quotation marks and brackets omitted); *see also* 11 U.S.C. § 1129(b)(2)(B)(ii) ("[T]he condition that a plan be fair and equitable with respect to a class includes the following requirements . . . [w]ith respect to a class of unsecured claims . . . the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.").

The record indicates that Class 3(a) claimants voted to accept the Plan 7-1; however, only 51.7% of the dollar value of Class 3(a) claimants voting voted to accept the Plan. Appellee R. 606, ¶ 14. Therefore, pursuant to 11 U.S.C. § 1126(c), Class 3(a) is deemed to have rejected the Plan. The bankruptcy court found that the Plan does not discriminate unfairly and is fair and equitable with respect to Class 3(a) because no class junior to Class 3(a) will receive any property under the Plan. Appellant R. 17. Because the court has concluded that the Breach Claim is not subject to mandatory subordination under § 510(b), the court determines that the Class 3(b) Breach Claim is not a "junior claim" to the Class 3(a) general unsecured creditors. As Class 3(b) is not junior to Class 3(a),

allowing Class 3(b) claimants to share *pro rata* any distributions with Class 3(a) claimants, does not violate the absolute priority rule because there is no class junior to Class 3(a) that will receive property when Class 3(a) has not been paid in full.  The court determines that the plan is fair and equitable and does not unfairly discriminate between similarly situated creditors,  thus satisfying the requirements of 11 U.S.C. § 1129(b)(2)(B)(ii), which permits a confirmation or a "cram down" of the plan over the objection of Class 3(a).  Accordingly, the court holds that the bankruptcy court did not err in finding that the payments to the shareholders when the general unsecured creditors were not paid in full does not violate the absolute priority rule.

### IV.     Conclusion

For the reasons herein stated, the court **affirms** the bankruptcy court's February 7, 2012 Order Confirming Trustee's Amended Plan of Liquidation for the Debtor.  The clerk of court shall prepare, sign, and enter judgment in accordance with this Memorandum Opinion and Order pursuant to Rule 8016(a) of the Federal Rules of Bankruptcy Procedure.

**It is so ordered** this 12th of April, 2013.

*Sam A. Lindsay*
Sam A. Lindsay
United States District Judge